* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I through IV of the Discussion.

[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1356 
OPINION
Defendant James Lee Brown HI appeals from his conviction for selling methamphetamine. (Health Saf. Code, § 11379, subd. (a).) In the *Page 1357 
published portion of this opinion, we conclude defendant is entitled to the retroactive benefit of an amendment to Penal Code section 4019 that went into effect after he was sentenced but before his conviction became final. (Further undesignated section references are to the Penal Code.) That amendment provides for enhanced presentence conduct credits for certain classes of offenders. In the unpublished portion of the opinion, we agree with defendant the abstract of judgment must be corrected to delineate the specific fines and fees imposed, but reject defendant's other contentions of judicial misconduct, prosecutorial misconduct, and sentencing error. We therefore affirm the judgment but remand with directions to provide a detailed recitation of the fines and fees imposed and to correct the abstract of judgment.
 FACTS AND PROCEEDINGS
Between May and August 2006, at the invitation of the tribe, a law enforcement task force conducted an ongoing undercover drug buy program at a tribal casino near Susanville. Agent Lucy Villones was part of the task force. In her role, Villones would go to the casino and pose as a patron. She would generally sit next to other casino patrons and engage them in small talk. Sometimes she was directed by Marvin Clark, a local officer experienced in recognizing local drug dealers, to target specific people. Eventually she would ask the target if he or she knew where she could "get a little something." Consistent with the approach of drug users and dealers, Villones avoided naming a specific drug in these conversations.
Villones was working at the casino on August 11, 2006, and August 12, 2006. She was wearing hidden video and audio monitoring equipment. Parole agent Clark was monitoring the interactions on the casino video surveillance system. About 2:00 a.m., Villones started talking with Lisa Nunes, a target. Villones had known Nunes for about one month and had previously purchased narcotics from her. Villones asked Nunes if she could "get me something today?" Nunes replied she knew where to get something. Villones followed her, and Nunes made a phone call. Nunes reported, "My friend's got company, so we can't do anything now." Villones told Nunes she would be around if Nunes could find something for her, and Nunes walked away.
A few minutes later, Nunes returned to Villones with defendant. Villones had met defendant earlier in the buy program and had been directed to speak with him by Clark. On those earlier occasions, she had asked him if he knew where she could get something to party with and he said "No." He appeared unapproachable. This time, defendant asked Villones what she wanted and she answered, "Whatever you can get," "maybe a gram." He asked her to go to an apartment and she told him she could not leave the casino. Defendant explained he needed to leave the casino, because he did not want to do *Page 1358 
anything on the reservation and possibly lose his gambling privileges. Defendant walked away, made a cell phone call and motioned for Nunes to join him. Nunes joined defendant and, in a few minutes, Nunes returned to Villones and told her the cost would be $80. Nunes also assured Villones the quality of defendant's drugs would be superior to the other drug dealer's. Nunes told Villones they had to walk to the store at the gas station to get the drugs and Villones reiterated she would not leave the casino. Nunes agreed to handle the transaction for Villones, for a payment of $1.00. Villones gave Nunes the money and Nunes and defendant left the casino together.
Defendant and Nunes went to a mini-mart near the gas station. A red car drove up and defendant went up to the car and spoke with the passenger, James Mayberry. Defendant and Mayberry went into the store together. Shortly thereafter, Mayberry left the store alone, got back in the car, and left the gas station. Defendant and Nunes left the store and walked back to the casino. On the way, defendant handed Nunes something, which she put in her pocket.
About 15 minutes after they left the casino, Nunes and defendant returned. Defendant walked past Villones and Nunes delivered 0.5 grams of methamphetamine to Villones.
Defendant was later arrested and interviewed by Officer Martin. Officer Martin asked defendant if he remembered participating in a drug sale with Nunes. Defendant replied, "I know she come up to — [Nunes] come up saying, `Could you hook, could you hook a friend up?'" Martin then asked defendant if, when he and Nunes went to the mini-mart, a red car had pulled in, "offloaded the dope" to him which he then handed to Nunes to make the deal with Villones. Defendant answered, "I think that's the way, I guess. I just give it to — what's her name? . . . She asked me and I gave it to her. I don't remember the rest of it. I don't know if I went back into the casino at that point."
Defendant and Mayberry testified that defendant wanted Mayberry to meet a girl. Mayberry's roommate, Jeremy Hughes, agreed to drive Mayberry to the casino in his red car. On his way to meet the girl, Mayberry stopped at the convenience store to buy cigarettes. They ran into defendant at the store and defendant told Mayberry the girl was in the store. They went in the store together and Mayberry bought cigarettes. Mayberry did not meet the girl because she was in the bathroom, but told defendant to give her his phone number. He wrote the number down and handed it to defendant. Defendant handed that number to Nunes on their walk back to the casino. Defendant believed Nunes had drugs on her, but denied that he had received any drugs *Page 1359 
or given Nunes any drugs. He remembered speaking with Villones and her referencing $80, but he walked away, not knowing what she was talking about.
Nunes had previously gotten drugs from defendant. That night, she asked defendant if he could procure $50 worth of methamphetamine and he said he could. The two went to the gas station; defendant met with someone, got methamphetamine, and gave it to her. He did not try to introduce her to a man.
Defendant was charged with, and a jury found him guilty of, one count of selling methamphetamine. He was sentenced to the midterm of three years in state prison.
Defendant appealed, contending the trial court improperly coerced the jury into reaching a verdict, the prosecutor engaged in misconduct during closing argument, the trial court abused its discretion in imposing a midterm sentence and punishing defendant for having gone to trial, and the abstract of judgment must be corrected to delineate the specific fines and fees imposed. In an opinion filed on January 13, 2010, we agreed with defendant on the latter point but otherwise affirmed the judgment. (People v. Brown (Jan. 13, 2010, C056510) [nonpub. opn.].)
On January 29, 2010, defendant filed a petition for rehearing, arguing he is entitled to the benefit of an amendment to section 4019 that went into effect on January 25, 2010, and provides for enhanced presentence conduct credits. We granted the petition and vacated our January 13, 2010, decision.
 DISCUSSION I Judicial Misconduct
Defendant contends the trial court committed judicial misconduct "when it stated that argument, instructions and deliberations could begin and end after 5:00 p.m. on the second day of trial, gave a limited break, and made the jury skip dinner to accommodate this schedule." Noting the absence of an objection to the evening session, defendant argues an objection would have been futile and counsel's failure to object rendered his assistance ineffective.
The presentation of evidence concluded shortly before 4:50 p.m. after a single day of trial testimony. At that time, the court called the jury in and said, "Folks, let me chat with you for a minute. There are two things we can do. What we have left is for me to instruct you on the law. Then the lawyers make their statements and argument to you and you go to deliberate. I'm more than happy to go ahead here and have the early evening to do that. If it's agreeable with you, if [it] wouldn't cause some great problem for one of you folks. Anyway does anybody have [a] real strong problem just going ahead and seeing if we can conclude today? I see nobody is saying that. Yes sir?"
One of the jurors asked if there could be a little recess. The court said, "You bet?" The juror asked if it could be long enough to allow "time to get to Johnstonville and back?" The court clarified, "Twenty minutes?" The juror indicated that 20 minutes was "all I ask." The court replied, "At this hour that's a long time. Is there something you can be taken [sic] care of by phone call?" The juror answered, "No. That's all right. I will live. I will live." The court said, "Okay." The juror added, "I'm not going to be the party pooper." The court finished, "Okay. Well, that's good. I'm going to take a recess right now. We'll take a ten-minute recess. Please keep the admonition in mind. . . . We'll be in recess about ten minutes. When we come back I will give you the bulk of the instruction on the law. The attorneys will make their arguments to you. I will give the concluding instructions and you will retire to deliberate."
Neither party objected to having the session continue past 5:00 p.m. Neither party objected to the court's specific comments. Neither party requested a dinner break or discussion regarding a dinner break. The jury reconvened at 5:10 p.m. Following instruction and argument, the jury began deliberations at 6:10 p.m. and reached its verdict at 7:00 p.m.
Defendant contends this discussion by the court constituted misconduct in that it coerced the jury into reaching a verdict and "unmistakably signaled the court's belief that deliberations would be brief, a signal which, in light of the nature of the evidence, demonstrated the court's belief that defendant was guilty." There was no objection at the trial level to the court's offer to allow the jury to begin deliberations in the early evening or to the court's comments to the effect that they could see if the trial might be concluded that day. As such, the contention is forfeited. (People v. Lewis and Oliver (2006) 39 Cal.4th 970,1038; People v. Anderson (1990) 52 Cal.3d 453, 469.)
In anticipation of that conclusion, defendant contends in the alternative that an objection would have been futile or counsel was ineffective for failure to object. We are not persuaded as to either contention.
There is nothing in the record that suggests an objection would have been futile. There is nothing to suggest the court had predetermined a course of action and would not have fairly considered an objection. In fact, given the discussion with the juror that is on the record, the suggestion is to the contrary. The court left the choice of whether to proceed with the jury. The court considered the request of a juror for a 20-minute break before beginning deliberations and concluded that, at such a late hour, that would be too long of a break. Further, the court's comments to the jury were not so suggestive or coercive that an admonition would not have cured any potential harm. We cannot find that a timely objection would have been futile.
Nor can we find that counsel's performance was ineffective. To establish ineffective assistance of counsel, defendant must show, by a preponderance of the evidence, that his counsel's representation fell below the standard of a competent advocate and a reasonable probability exists that, but for counsel's errors, the result would have been different. (People v. Ledesma (1987) 43 Cal.3d 171, 216-218 (Ledesma).) A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. (People v. Bolin (1998) 18 Cal.4th 297, 333.) In determining whether counsel's performance was deficient, we exercise deferential scrutiny and "assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (Ledesma, supra, 43 Cal.3d at p. 216.) We presume counsel's conduct fell within the wide range of reasonable professional assistance and tactical errors are generally not deemed reversible. (People v. Maury (2003) 30 Cal.4th 342, 389.) Our review is limited to the record on appeal and we must reject a claim of ineffective assistance "if the record sheds no light on why counsel acted or failed to act in the manner challenged unless (1) counsel was asked for and failed to provide a satisfactory explanation or (2) there simply could be no satisfactory explanation." (People v. Burgener (2003) 29 Cal.4th 833,880.)
Counsel's failure to object to extending the trial day or to the comments the judge made to the jury did not constitute ineffective assistance of counsel. The court made no comment on the evidence or the witnesses. The court ultimately put the matter in the jurors' hands, asking if it was "agreeable" for them to stay. The comments did not put any time pressure on the jury, did not suggest the case was simple and would require only brief deliberation, and did not imply that the case only warranted desultory deliberation. (See People v. Gurule (2002)28 Cal.4th 557, 632; People v. Anderson, supra, 52 Cal.3d at p. 469;People v. Keenan (1988) 46 Cal.3d 478, 534.) The court did nothing more than afford the jury the opportunity, if the jury wanted it, to see if it could conclude the trial that day.
Because there was no misconduct, there was nothing for defense counsel to properly object to. Accordingly, defendant cannot meet the first prong of the test for ineffective assistance of counsel — that counsel's performance fell below an objective standard of reasonableness. (Peoplev. Price (1991) 1 Cal.4th 324, 440.)
 II Prosecutorial Misconduct
Defendant next contends the prosecutor committed prejudicial misconduct during closing argument "by asserting defendant had withheld material evidence, expressing a personal belief in defendant's guilt, and implying additional evidence of guilt existed, but was not presented at trial." Again recognizing the lack of objection to any portion of closing argument, defendant contends this was ineffective assistance of counsel. Again, we are not persuaded.
The applicable federal and state standards regarding prosecutorial misconduct are well settled. "`A prosecutor's rude and intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." [Citations.] But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "`the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (People v. Gionis (1995)9 Cal.4th 1196, 1214-1215.)
Defendant objects to two specific portions of the prosecutor's closing argument. At no point was any objection raised to these arguments. As defendant notes, "`[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.]" (People v. Lopez (2008) 42 Cal.4th 960, 966.) The lack of objection has forfeited this issue.
Again anticipating this conclusion, defendant contends the failure to object constituted ineffective assistance of counsel. We cannot agree. The standards for evaluating a claim of ineffective assistance of counsel are delineated above. In short, defendant must establish both that counsel's performance fell below an objective standard of reasonableness and that such deficient performance also resulted in prejudice to defendant. Defendant does not meet this burden.
The prosecutor argued regarding the testimony relating to Jeremy Hughes, the person defendant and Mayberry named as the driver of the red car at the convenience store. In the context of stating that his view was not the exclusive view of the evidence, the prosecutor argued: "This is my view on some of the evidence, what I think some of the evidence showed. Again, why does a guy go to meet somebody because he just writes his number down and leaves? It's interesting that just about every piece of the evidence corroborated by defendant has a different interpretation for filling in the blanks. Not until it's proved to the contrary. Hey, what about this Jeremy Hughes guy? Hey, I'm not the only lawyer in this courtroom with subpoena power.
Defendant knows him. Defendant knows where he's at. He was sitting in that car. He had an opportunity to come corroborate what Mr. Mayberry and [defendant] said. Where is he at? That's fair game. [¶] I know it's my obligation to prove this charge. It's the District Attorney's obligation to prove this charge beyond a reasonable doubt. Didn't know who he was until we got here to court today. We never knew where the car was until recently."
Defendant contends the above was improper argument because it implied "defendant had purposely decided not to exercise his subpoena power to call Hughes, which implied that defendant was withholding evidence, when it was not even shown that Hughes was available to testify."
It is well settled that "[c]omment on the failure to call a logical witness is proper. (People v. Ford (1988) 45 Cal.3d 431, 449; People v.Szeto (1981) 29 Cal.3d 20, 34; People v. Vargas (1973) 9 Cal.3d 470, 475.)" (People v. Bell (1989) 49 Cal.3d 502, 539.) Defendant's reliance onPeople v. Frohner (1976) 65 Cal.App.3d 94, 108-109 is misplaced. InFrohner, the prosecution was aware that the witness was unavailable. It was in that specific context that the court found the prosecutor's comments on the failure to call the witness was misconduct.
Unlike Frohner, in this case, there was no showing that Hughes could not be located or was otherwise unavailable. When, as here, "the defendant has taken the stand . . . and offered [a] . . . defense in which he identifies other persons who could support his testimony, and those witnesses are available and subject to subpoena, there should be no question but that comment is appropriate and permissible." (People v.Ford, supra, 45 Cal.3d at p. 447; see also People v. Gonzalez (1990)51 Cal.3d 1179, 1216, fn. 9.) It was not the prosecutor's duty to determine Hughes's availability before he could make the argument. Because the prosecutor's comments relating to the failure of defendant to call Hughes were proper comment on the evidence, counsel's failure to object was not deficient performance and cannot have resulted in ineffective assistance of counsel.
Defendant also contends the prosecutor committed misconduct in that he improperly stated his belief that defendant was guilty based on evidence not presented at trial.
During trial, defendant and Mayberry had explained the meeting at the mini mart as defendant simply trying to get Mayberry and Nunes together, romantically. Mayberry expressly denied ever using methamphetamine and denied bringing methamphetamine to the mini-mart.
In closing argument, the prosecutor was reviewing the evidence relating to the testimony of defendant and Mayberry and the events at the mini-mart. The prosecutor was raising inferences regarding the relative credibility and motives of the testifying witnesses, including defendant, and the likelihood of defendant's version of events. In that context, he stated "And if anybody's under the illusion I'm not thinking James Mayberry is selling dope, they'd be wrong. Let it be heard here." He then continued discussing the testimony and relative credibility of the witnesses, such as Nunes, the officers, defendant, and the information reflected on the tapes.
Defendant complains this argument was improper because the prosecutor did not qualify his statement that Mayberry was "selling dope" "by suggesting that Mayberry alone was involved in the sale. Considering the circumstances of the alleged sale, the only inference to draw was that [the] District Attorney also believed defendant was guilty of selling dope."
The prosecutor then finished his closing argument saying, "You know, [defense counsel] talked about this in jury selection. We have different roles. He has an obligation. He protects the interests of his client. His job is to single people out in the world, look at loopholes to get their client off. [¶] But the District Attorney's job is different in the sense that I don't do everything I can do to convict. Our job is to seek justice. We put out the facts, the truth, let it fall where it may. Let it fall where it may. That's what we are doing here today. We are standing up in front of you, wearing the white hat, being the good guys, saying to you, *Meth is bad,' and `This was a sale that happened that night, and he was part of that sale,' and you can't have this stuff. You saw Lisa Nunes. You saw what it's done to her. I don't care how much lipstick you put on a pig, it's still a pig. That's what's going on here today, trying to change it into something else. That's what I think your verdict of guilt is going to be based on."
Defendant argues this portion of the argument, when viewed in conjunction with the earlier statement about Mayberry being a drug dealer, "implied that more evidence of guilt existed, but that the District Attorney had refrained from presenting it out of a sense of justice." Thus, defendant's argument is that when combined, these arguments were an expression of personal belief in guilt, based upon evidence not before the jury. We frankly do not see how defendant can get that message from the prosecutor's, at worst, awkward argument.
"When arguing to the jury, it is misconduct for a prosecutor to express a personal belief in the defendant's guilt if there is a substantial danger that the jurors will construe the statement as meaning that the belief is based on information or evidence outside the trial record [citation], but expressions of belief in the defendant's guilt are not improper if the prosecutor makes clear that the belief is based on the evidence before the jury [citation]. . . ." (People v. Mayfield (1997)14 Cal.4th 668, 781-782.)
When viewed in context of the argument being made, we cannot agree with defendant's characterization of the prosecutor's comments. The comments regarding Mayberry were directed at the credibility of defendant's and Mayberry's testimony explaining the events at the mini-mart. The assertion of belief that Mayberry was a drug dealer was a fair inference from the evidence before the jury. That is, that defendant had been asked to procure methamphetamine, made a phone call to Mayberry, met him at the mini-mart, and a drug deal was concluded.
Moreover, even if the statement by the prosecutor was inappropriate, defense counsel responded specifically to the assertion in his own closing argument. He argued that Mayberry was a professional man with a degree in orthopedics who would not have put his career in jeopardy by testifying to protect defendant "from being convicted of buying drugs from him." He went so far as to characterize such an assertion as "absolutely crazy." Defense counsel may have made the tactical choice to respond to the matter in argument rather than object, believing this would be more persuasive to the jury. We cannot find such a tactical choice falls below the standard of professional norms.
Nor were the comments about the respective roles of the prosecutor and defense counsel misconduct. We disagree with defendant's assertion that the comments implied the prosecutor "had not presented all evidence of guilt because he was one of the good guys who sought justice." Again, we can discern no such implication. The prosecutor's comments were not an expression of a personal belief in defendant's guilt based on matters not in evidence. Rather, they expressed a confidence, a belief, in the evidence presented. (People v. Brown (1981) 119 Cal.App.3d 116, 133.)
Moreover, the comments appear to have been a response to some previous discussion of the respective roles of counsel made by defense counsel in the course of jury selection and an effort to focus the jury on what the prosecution believed to be the relevant facts of the case. The comments simply reiterated the distinction in the relative roles of counsel.
"[T]he prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (People v. Bemore (2000)22 Cal.4th 809, 846.) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (People v. Cummings (1993) 4 Cal.4th 1233, 1302, fn. 47.)
Here, the prosecutor's remarks regarding the roles of the prosecutor and defense counsel were fair comment and no misconduct occurred. The prosecutor has a duty to present facts and evidence to prove the charged crime beyond a reasonable doubt. Defense counsel has a duty to defend his client. The gist of the prosecutor's comments was that he had laid out the facts of a drug deal and defendant's involvement, irrespective of how defense counsel might try to argue the facts and change their appearance. This is so, notwithstanding the prosecutor's unfortunate description of defense counsel's role as "look[ing] at loopholes to get their client off."
Because the prosecutor's comments were proper argument and did not constitute misconduct, defense counsel's failure to object did not fall below the standard of an objectively reasonable professional and cannot support a claim of ineffective assistance of counsel.
 III Sentencing Issues
Defendant argues the trial court abused its discretion in imposing a midterm sentence despite the fact he was a first time offender and "committed the crime in response to repeated badgering by" Villones. Defendant cites the probation report, which recommended a grant of probation, and the court's reliance on a factual finding not supported by the evidence.
The People contend this argument was forfeited by defendant's failure to object below. However, there was extensive argument by defense counsel regarding the court's tentative decision. The purpose of requiring an objection at the trial level is to provide the court with the opportunity to correct the error. (People v. Marchand (2002) 98 Cal.App.4th 1056,1060.) We believe counsel's arguments regarding sentencing were sufficient to accomplish this purpose and therefore do not find the issue forfeited.
The probation report recommended defendant be placed on probation. The report relied on defendant's difficult past, his self-reported reluctant sale of methamphetamine to Villones, his expressed remorse, his prior positive contributions to the community, his lack of a prior record, and his voluntary acknowledgement of wrongdoing at an early stage of the proceedings.
The court issued a tentative ruling. The tentative ruling noted that defendant had not acknowledged wrongdoing at an early stage of the proceedings, but rather proceeded to a jury trial. The court also felt the probation officer had not adequately analyzed the facts of the case. Specifically, the court noted defendant had been involved as an active participant in the sale of drugs, which involved planning and sophistication. He was known as a source of drugs in the casino and appeared to be an "in-control" drug dealer on the videotapes.
Prior to the sentencing hearing, the court reiterated the error in the probation report, and stated it was denying probation. The court stated it would deny probation, finding defendant was engaged "in a retail drug sales operation that involved planning and a moderate level of sophistication. . . . From the evidence at trial it was clear that defendant was known as a source of illegal drugs. . . . [I]t was shown he was a cautious drug dealer. . . . He was an active participant in a business approach to sales of . . . methamphetamine." The court then indicated its intention to impose the "legal term" of three years. Both defense counsel and the prosecutor argued the matter to the court. At no time did defense counsel make any objection based on the court's reference to the middle term as the "legal term." The court then imposed sentence consistent with the tentative ruling.
Initially, we do not agree that the court's statement it was imposing the "legal term" of three years "demonstrates the court misunderstood the scope of its discretion" since there was no longer a presumption that the middle term should apply. It is defendant's burden to show affirmatively the court Page 21 misunderstood the scope of its discretion. (People v.Alvarez (1996) 49 Cal.App.4th 679, 695.) He has failed to do so. When read in context and in conjunction with defense counsel's arguments for probation and the court's articulation of various factors supporting its sentencing choice, the statement that the court would impose the "legal term" of three years was just reflective of the court's belief that the circumstances of the offense warranted imposition of the middle term, not that the middle term was the presumptive sentence.
Nor do we find the court abused its discretion in denying defendant probation and sentencing him to the middle term. In making its sentencing decision, the trial court may consider all circumstances in aggravation and mitigation. (§ 1170, subd. (b).) In addition to the statutory aggravating and mitigating factors, the court may consider any criteria reasonably related to the defendant and the crime committed. (People v.Brown (2000) 83 Cal.App.4th 1037, 1044-1045.)
In passing, we note defendant makes much of the trial court's observation that defendant did not admit guilt at an early stage and, instead, went to trial, arguing that the court's comments can only be construed as its intention to punish defendant for exercising his right to a jury trial. We read the matter differently. The trial court was merely noting that the record did not support one of the factors in mitigation of sentence that the probation report apparently relied on in making its recommendation of probation. It is the defendant's burden to establish the trial court imposed a harsher sentence as a punishment for his election to go to trial. (People v. Szeto, supra, 29 Cal.3d at p. 35.) He has not met that burden here.
The court's sentencing decision is within its broad discretion and must be affirmed unless arbitrary or irrational. (People v. Avalos (1996)47 Cal.App.4th 1569, 1582; People v. Lamb (1988) 206 Cal.App.3d 397,401.) "`The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'" (People v. Superior Court (Alvarez) (1997)14 Cal.4th 968, 977-978.)
Here, the court sat through the trial and observed the witnesses testify, including defendant. The court viewed the videotapes of defendant and the other parties during the drug transaction. The court read and considered the probation report and the arguments of counsel. The probation officer and defense counsel viewed defendant as having "succumbed" to pressure from Nunes who "kept bugging him." The court was entitled to find other evidence more persuasive. After watching the videotapes and the witnesses' testimony, the court's view of the evidence was that defendant presented himself as an "in-control drug seller" who was cautious, not reluctant.
The court also found defendant was engaged in an operation that involved planning and a moderate level of sophistication. This conclusion is supported by the evidence that defendant was able immediately to make a single phone call to his supplier, and arrange for the drug deal to be conducted offsite, away from the casino where there could be additional repercussions, such as losing his gambling privileges. That defendant did not carry the drugs on him does not militate against a finding that he was engaged in this as a business operation with some sophistication. Rather it supports the court's conclusion that defendant was cautious in his drug dealings. Similarly, that defendant did not personally handle the transaction, but instead acted as a middleman between Mayberry and Villones. Using Nunes to actually deliver the drugs also supports the trial court's conclusion that defendant was part of a retail drug operation being conducted with some level of planning and sophistication.
There was also support for the court's conclusion that defendant was known as a source for drugs at the casino. Villones had been directed by a local officer familiar with local drug dealers, to approach defendant directly as part of the undercover operation. In addition, when Villones approached Nunes about getting some methamphetamine, Nunes said she knew where to get it and went to defendant. Nunes assured Villones that the drugs from defendant would be a better quality than those she was getting from "the other dealer." Nunes seeking defendant out as a supplier of drugs, the reputation of quality of the drugs defendant provided, and the previous direction to Villones to approach defendant about buying drugs support the court's finding that defendant was known as a source of illegal drugs at the casino.
Thus, contrary to defendant's claim, the findings of the court underlying its sentencing decision are supported by substantial evidence. These findings support both the denial of probation and the imposition of the middle term. There was no abuse of discretion.
 IV Fines and Fees*
Relying on People v. High (2004) 119 Cal.App.4th 1192, defendant contends the oral pronouncement of judgment and the abstract of judgment do not properly delineate the components of the various fines and fees imposed by the trial court. The People concede the point.
 V Section 4019
A defendant sentenced to state prison following a criminal conviction is entitled to credit against the sentence imposed for all days spent in custody prior to sentencing, including days served as a condition of probation. *Page 1360 
(§ 2900.5, subd. (a).) In addition, the defendant may be entitled to conduct credits pursuant to section 4019.
Prior to January 25, 2010, subdivisions (b) and (c) of section 4019 provided that "for each six-day period in which a prisoner is confined in or committed to" a local facility, one day is deducted from the period of confinement for performing assigned labor and one day is deducted from the period of confinement for satisfactorily complying with the rules and regulations of the facility. (Stats. 1982, ch. 1234, § 7, p. 4553.) Former subdivision (f) of section 4019 provided that "if all days are earned under this section, a term of six days will be deemed to have been served for every four days spent in actual custody." (Stats. 1982, ch. 1234, § 7, pp. 4553, 4554.)
In October 2009, the Legislature passed Senate Bill No. 18 (2009-2010 3d Ex. Sess.) (Senate Bill 18) which, among other things, amended section 4019. Senate Bill 18 amended section 4019 to provide for the accrual of presentence credits at twice the previous rate for all prisoners except those "required to register as a sex offender," "committed for a serious felony, as defined in Section 1192.7" or who have a prior conviction for a serious or violent felony. (§ 4019, subd. (b)(2); see also id., subd. (c)(2); Stats. 2009, 3d Ex. Sess., ch. 28, § 50.) New subdivisions (b)(1) and (c)(1) of section 4019 provide that one day of work credit and one day of conduct credit may be deducted for each four-day period of confinement or commitment. According to revised subdivision (f), "if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody. . . ." (§ 4019, subd. (f); see also Stats. 2009, 3d Ex. Sess., ch. 28, § 50.) Senate Bill 18 went into effect on January 25, 2010.
Defendant here served a total of 62 days in presentence confinement. In addition to these 62 days, defendant was awarded conduct credits under former section 4019 of 30 days. Defendant contends he is entitled to the enhanced credits provided under Senate Bill 18. He has no prior convictions, is not required to register as a sex offender, and the current offense is not a serious felony under section 1192.7. Under revised section 4019, defendant would be entitled to two days of conduct credit for every two days of actual custody. Defendant argues he is entitled to the benefit of a statutory amendment that reduces punishment or increases credits unless the legislation contains a savings clause making it applicable prospectively only. He argues Senate Bill 18 contains no such savings clause.
The People respond that Penal Code amendments are presumed to operate prospectively unless the Legislature specifies otherwise and that presumption has not been rebutted here. Section 3 states that no part of the Penal Code is retroactive "unless expressly so declared." The People acknowledge that in In re Estrada (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, *Page 1361 408 P.2d 948] (Estrada), the California Supreme Court created an exception to section 3 for statutory amendments that reduce punishment for a particular crime. According to the high court: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (63 Cal.2d at p. 745.)
The People contend "it is not clear that a change in the accrual rate of conduct credits constitutes an `amendatory statute lessening punishment'" subject to the presumption of retroactivity recognized inEstrada. They argue an amendment increasing conduct credits is not intended to reduce punishment but to increase the incentive for good behavior. Therefore, the rationale of Estrada — that the Legislature has determined the former punishment was too severe — does not apply. They argue the purpose of encouraging good behavior is not served by awarding additional credits for conduct that has already occurred.
The question before us is one of legislative intent. (People v. Floyd
(2003) 31 Cal.4th 179, 184 [1 Cal.Rptr.3d 885, 72 P.3d 820]; Estrada,supra, 63 Cal.2d at p. 744.) Where the Legislature expressly states its intent that an enactment be applied retroactively or prospectively, we need look no further. The question then becomes whether the stated intent otherwise violates a provision of the state or federal Constitution.
Senate Bill 18 contains no express statement of intent. We must therefore look elsewhere. We begin with the two alternate presumptions discussed above. If the amendment is a reduction in punishment, Estrada
requires that we presume retroactive application, at least as to cases not yet final on the effective date. (See In re Moreno (1976)58 Cal.App.3d 740, 742 [130 Cal.Rptr. 78].) For all other amendments, section 3 requires that we presume prospective application. However, in either case, the presumption may be rebutted by evidence demonstrating a contrary intent.
In People v. Hunter (1977) 68 Cal.App.3d 389 [137 Cal.Rptr. 299] (Hunter), the Court of Appeal considered an amendment to section 2900.5 allowing for an award of presentence custody credits. The legislation contained no express statement of retroactive or prospective application. (68 Cal.App.3d at p. 392.) The court concluded the amendment "must be *Page 1362 
construed as one lessening punishment" within the meaning of Estrada.(Id. at p. 393.) According to the court: "True, Estrada deals with a statute which lessens the maximum sentence for a particular crime while the amendment to section 2900.5 concerns credit against a lesser sentence imposed as a condition of probation. But in the circumstances which we here consider, the distinction is without legal significance." (Ibid.)
The People argue Hunter is distinguishable, because it dealt with actual custody credits rather than conduct credits. According to the People, this distinction is significant, because the purpose of awarding actual credits is to reduce the remaining punishment imposed, whereas the purpose of awarding conduct credits is to create an incentive for good behavior. According to the People, that purpose is not served by awarding credits for past conduct. Hence, so the argument goes, the reasoning ofEstrada does not apply.
However, in People v. Doganiere (1978) 86 Cal.App.3d 237 [150 Cal.Rptr. 61] (Doganiere), the Court of Appeal applied Estrada to an amendment involving conduct credits. In that case, the People raised the same argument asserted here — that Estrada does not apply because an amendment extending the opportunity to earn conduct credits is designed to control future behavior. (Id. at p. 239.) Although the court found the argument interesting, it was not persuaded. (Ibid.) The court explained: "Under Estrada, it must be presumed that the Legislature thought the prior system of not allowing credit for good behavior was too severe." (Id. at p. 240.)
The People assert that the reasoning of Doganiere is unsound. They argue "[t]he awarding of conduct credit was not a legislative determination that sentences were too severe, rather, it was a legislative determination that motivating and incentivizing good behavior would help to maintain discipline and minimize threats to prison and jail security."
According to the People, the opposite result was reached in In reStinnette (1979) 94 Cal.App.3d 800 [155 Cal.Rptr. 912] (Stinnette). InStinnette, the Court of Appeal considered an amendment to section 2931 under the Determinate Sentencing Act (DSA) allowing for prisoners to earn conduct credits but restricting application of the amendment to time served after the effective date. However, the Stinnette court did not address the question whether it must be presumed the Legislature intended retroactive application. The DSA expressly provided for prospective application. The issue in Stinnette was whether this prospective application violated equal protection. The court concluded it did not, because there was a rational basis for treating those who had already begun serving their sentences differently from those who began serving their sentences after the effective date. (94 Cal.App.3d at pp. 805-806.) *Page 1363 
The People further argue that, even if we presume retroactive application, such presumption is rebutted by the underlying purpose of Senate Bill 18. They argue that purpose is twofold: to address budgetary concerns by reducing prison populations, and to create further incentives for good behavior. The People argue the first purpose is served by either retroactive or prospective application, but the second purpose is served only by prospective application. According to the People, if the Legislature's only concern was budgetary, it could have served that purpose more directly by granting additional credits to all prisoners, regardless of conduct.
According to the People, their interpretation is supported by other provisions of Senate Bill 18. Section 39 of the act amends Penal Code section 2933.05 to allow for up to six weeks of credit for participation in certain rehabilitation programs. (Stats. 2009, 3d Ex. Sess., ch. 28, § 39.) Section 41 of the act amends Penal Code section 2933.3 to allow for additional credits for participation in a firefighting or conservation camp program. (Stats. 2009, 3d Ex. Sess., ch. 28, § 41.) Senate Bill 18 also contains provisions requiring counties to develop and implement programs to reduce recidivism. (Stats. 2009, 3d Ex. Sess., ch. 28, § 36.) According to the People, these provisions demonstrate the Legislature sought to reduce prison populations while at the same time minimizing security risks by allowing early release only of "those prisoners who have demonstrated an ability to safely reenter society, i.e., those with consistently good behavior, and those who have dedicated themselves to vocational pursuits."
However, the People's argument cuts both ways. If the intent of the Legislature was to reduce prison populations, but to do so responsibly by providing early release only for less serious offenders who have demonstrated good behavior, that purpose can also be served by retroactive application of revised section 4019. Rather than simply granting additional credits to all prisoners, as the People suggest might have been done if the Legislature's only concern was budgetary, Senate Bill 18 increased credits only for those prisoners who earned them. In other words, only those prisoners who have demonstrated good behavior, both in the past and going forward, would be entitled to the enhanced credits.
Furthermore, the People's argument overlooks the fact that amended section 4019, if applied prospectively, would provide additional credits for past behavior. A prisoner sentenced shortly after the effective date of Senate Bill 18 would be granted the enhanced benefits notwithstanding the fact much of his or her presentence custody occurred before the effective date and therefore at a time when the additional incentives were not in place.
In our view, the present matter is governed by Estrada. Whatever the ultimate purpose or purposes of the amendment to section 4019, the effect of *Page 1364 
the amendment is to reduce the overall time of imprisonment, and, thus, the punishment, for those less serious offenders who have demonstrated good behavior while in custody. A prisoner released from prison one day sooner has been punished one day less in prison than he would have been had there not been a change in the law. This conclusion is consistent with other provisions of the legislation intended to provide additional means of reducing prison population and with the overall intent of the Legislature to address the state's fiscal emergency. (See Stats. 2009, 3d Ex. Sess., ch. 28, § 62.)
We recognize that, in Estrada, the Legislature's stated purpose in passing the law there at issue was to lessen the punishment for certain crimes. The Legislature has not been as direct in making its purposes known here. Even so, it appears to us that the Legislature plainly did intend with this legislation to ease budgetary concerns by reducing the prison population. To accomplish this, the Legislature reduced the total term of imprisonment by increasing conduct credits which necessarily reduces the punishment for certain crimes. The holding in Estrada
logically applies here.
However, even without the presumption of retroactivity, a legislative intent that revised Penal Code section 4019 be applied retroactively might reasonably be inferred from section 59 of Senate Bill 18. It reads: "The Department of Corrections and Rehabilitation shall implement the changes made by this act regarding time credits in a reasonable time. However, in light of limited case management resources, it is expected that there will be some delays in determining the amount of additional time credits to be granted against inmate sentences resulting from changes in law pursuant to this act. An inmate shall have no cause of action or claim for damages because of any additional time spent in custody due to reasonable delays in implementing the changes in the credit provisions of this act. However, to the extent that excess days in state prison due to delays in implementing this act are identified, they shall be considered as time spent on parole, if any parole period is applicable." (Stats. 2009, 3d Ex. Sess., ch. 28, § 59.) Arguably, if the Legislature did not intend retroactive application, it would not have been concerned with "delays in determining the amount of additional timecredits to be granted against inmate sentences resulting from changes in law pursuant to this act." (Ibid., italics added.)
The People contend the foregoing provision refers to a different portion of Senate Bill 18. In section 41 of Senate Bill 18, the Legislature amended Penal Code section 2933.3 to allow for enhanced credits for those inmates who have completed training for assignment to a conservation camp or as an inmate firefighter or who have been actually assigned as inmate firefighters. (Stats. 2009, 3d Ex. Sess., ch. 28, § 41.) Subdivision (d) of revised section 2933.3 reads: "The credits authorized in subdivisions (b) and (c) shall only *Page 1365 
apply to inmates who are eligible after July 1, 2009." (Pen. Code, § 2933.3; see also Stats. 2009, 3d Ex. Sess., ch. 28, § 41.) The People argue the foregoing subdivision (d) is an express indication of retroactivity to which section 59 of Senate Bill 18 was intended to apply.
However, while the People are clearly correct that section 59 of Senate Bill 18 applies to any recalculations required by the amendment to Penal Code section 2933.3, this does not preclude application of the provision to the amendment of Penal Code section 4019, or other amendments in Senate Bill 18, as well. Arguably, if the Legislature had intended section 59 to apply only to one amended provision in Senate Bill 18, it is reasonable to assume it would have placed that section with the single amendment, rather than at the end of the overall enactment. At any rate, while section 59 of Senate Bill 18 is certainly not an ironclad statement of legislative intent, it does provide some insight into what the Legislature sought to accomplish.
Senate Bill 18 "addresses the fiscal emergency declared by the Governor by proclamation on December 19, 2008." (Stats. 2009, 3d Ex. Sess., ch. 28, § 62.) Its provisions provide various means by which prison populations may be reduced, thereby easing prison overcrowding and lowering cost. Prior to the effective date of Senate Bill 18, section 4019 provided incentive for good behavior. Although the amendment to section 4019 effected by Senate Bill 18 provides further incentive, it is obvious the true intent of the legislation was to reduce the time in prison for eligible defendants. As such, it must be presumed the legislation was intended to be applied retroactively (Estrada, supra,63 Cal.2d at p. 748), unless a contrary intent is indicated. Rather than demonstrating a contrary intent, section 59 of Senate Bill 18, along with the overall purpose of the legislation, suggests the Legislature intended that the amendment to Penal Code section 4019 be applied retroactively, at least as to those eligible defendants whose convictions were not final on the effective date. Therefore, we conclude defendant is entitled to the additional conduct credits provided by amended section 4019. Because defendant served 62 days of presentence custody, he is entitled to 62 days of conduct credits.
 DISPOSITION
The judgment of conviction is affirmed. However, the matter is remanded to the Lassen County Superior Court with instructions to provide a detailed recitation of all fees, fines and penalties on the record and to amend the abstract of judgment to reflect these fees, fines and penalties as well as an *Page 1366 
increase in presentence conduct credits to 62. A certified copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation.
Sims, Acting P. J., and Butz, J., concurred.
* See footnote, ante, page 1354. *Page 1367