184 Cal.App.4th 271 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
GLORIA DELGADO, Defendant and Appellant.
No. B213271.
Court of Appeals of California, Second District, Division Six.
April 29, 2010.
As modified May 17, 2010.
*273 Linda Acaldo, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven E. Mercer and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
COFFEE, J. 
Gloria Delgado appeals from the judgment following her conviction by jury of a criminal threat, an attempted criminal threat, dependent adult abuse, and two misdemeanor business obstruction offenses.[1] (Pen. *274 Code, §§ 422, 664, 368, subd. (b)(1), 602.1, subd. (a).)[2] The court sentenced her to four years in prison (a three-year midterm for dependent adult abuse; consecutive terms of eight and four months, respectively, for a criminal threat and an attempted criminal threat; and concurrent terms of 90 days for the business obstruction offenses). Appellant challenges the sufficiency of the evidence to support her criminal threat and attempted criminal threat convictions, and contends that her dependent adult abuse conviction requires reversal because the court failed to give the jury a unanimity instruction. She also argues that she is entitled to the retroactive benefit of an amendment to section 4019 that went into effect after she was sentenced, and thus to receive a total of 188 days of presentence conduct credits. We affirm and remand the case to the superior court with directions to amend the abstract of judgment to increase appellant's presentence conduct credits to 188 days.

FACTUAL AND PROCEDURAL BACKGROUND

Prosecution Evidence
In 2007, appellant's adult son, Paul Murillo, lived in the subacute unit of St. John's Pleasant Valley Hospital (St. John's). His arms and legs are paralyzed and he needs help breathing, eating and bathing.
Appellant had a power of attorney for Murillo. She told staff members that if they turned him, she would have them arrested for assault. Murillo had a stage two decubitus ulcer, a sore that can result when a patient is not turned from side to side. If decubitus ulcers become infected, they can be fatal. John Jessop-Ellis, the nursing director of St. John's subacute unit, told appellant it could cause Murillo harm if he was not turned, but she refused to authorize staff to turn him. After visiting hours, with Murillo's permission, the staff turned him, and his ulcer healed.
A doctor at St. John's ordered that Murillo be weaned from the ventilator to strengthen his lungs. After a therapist took Murillo off the ventilator twice, appellant forbade the staff from trying to wean him from the ventilator.
On December 16, 2007, because Murillo had a problem that caused him pain, his doctor ordered staff to take him to St. John's emergency unit. The emergency unit was especially busy that day. Patients were waiting four to six hours to receive care. The emergency room doctor who evaluated Murillo concluded that he should return to his room. Appellant refused to permit staff *275 to move Murillo back to his room and blocked their access to him. She said that he was not receiving necessary care at St. John's and insisted that he be transferred to another facility. Murillo was using a ventilator. Appellant told staff to disconnect his ventilator so that she could "bag" him and drive him to another hospital. (Bagging involves placing a bag over the patient's tracheotomy and squeezing it to force air into the lungs so that the patient can breathe.) It is not safe for a ventilator-dependent patient to ride as the sole passenger while the driver "bags" him.
Maydeen Hanel, a nursing administrator, told appellant that Murillo could not be moved without authorization from his primary care doctor and a doctor at the receiving facility. She also explained that Murillo needed an ambulance with qualified personnel to transport him. Appellant was loud and confrontational and she refused to accept Hanel's explanation. Appellant's conduct "pulled all the nursing staff away from all the patients at that time" and impacted the entire hospital. The emergency unit's on-call doctor could not give patients his attention because he had to deal with appellant. The hospital contacted the Ventura County Sheriff's Department.
The hospital director, Robert Hacker, went to the emergency room and told appellant that she was disrupting the work of the hospital staff, and asked her to leave. When she refused, he directed her to leave, but she again refused to leave. Ventura County Sheriff's Department Deputy Ron Clayton arrived at St. John's about 8:00 p.m. Appellant stayed in the doorway, blocking entrance to Murillo's room. She was uncooperative and agitated when Clayton addressed her. She yelled and repeatedly demanded that Murillo be released into her care. Clayton asked appellant to leave the hospital, stating that he did not want to have to remove her forcefully. Hacker explained that if she did not leave, Clayton would forcefully remove her. After appellant repeatedly refused to leave, Clayton arrested her and removed her from the hospital.
On December 25, 2007, Murillo had a highly contagious and potentially deadly bacterial infection called methicillin-resistant Staphylococcus aureus (MRSA). Anyone who planned to come within three feet of a patient with MRSA was required to wear isolation gear (a gown and gloves). A sign outside Murillo's room in the subacute unit instructed people to wear isolation gear before entering his room. The gear was stored in a cart just outside Murillo's room. On December 25, when appellant visited Murillo, she refused to wear isolation gear.
Hacker went to the hospital to speak with appellant on December 25. When he told her to follow hospital policies and wear isolation gear, she refused to do so. Appellant's conduct disrupted the subacute unit and interfered with Murillo's and other patients' care. Hacker told her she was *276 disrupting the staff's ability to care for patients, and that she must leave. Appellant was loud and refused to leave. Because subacute unit patients are fragile, loud noises distress them. A deputy sheriff escorted her from the hospital and arrested her.
Maria Norma Kern and Gabiola Grimaldo worked in St. John's subacute unit. On January 10, 2008, they gave Murillo a scheduled whirlpool bath and took him back to his room. Greg Goebel helped them put a shirt on Murillo and left the room. Kern and Grimaldo were still cleaning the water and towels from the area surrounding Murillo's bed.
After Murillo said that he wanted to talk to his mother (appellant), Kern dialed the phone for him. Murillo used headphones to speak on the phone. Murillo told appellant that Kern and Grimaldo had hurt his back and neck. Kern and Grimaldo then heard appellant scream, "Tell them I am going to find out where they live and I am going to come out and get them." Murillo relayed the threat to them. Grimaldo recalled that he said, "My mom wants to find out where you guys live because my mom is going to get you ...." Kern recalled that he said, "My mom says she is going to find where you live because ... she is going to get you because you are F dumb and if you don't know what to do, F this and F that." Murillo used profanity and called Kern and Grimaldo degrading names. They left his room. The nurses testified that they did not hurt Murillo.
Kern and Grimaldo knew appellant's history of having "bad tantrums," yelling, throwing things, kicking carts, and pushing tables toward hospital staff. Murillo had told Kern that his shin tattoos were gang-related. Grimaldo understood that Murillo's injuries resulted from a gang-related shooting. Appellant's threat caused Grimaldo to fear for her safety. Kern asked for an escort home on the night that appellant threatened them.

Defense Evidence
Murillo testified that he was taken to St. John's emergency room on December 16, 2007, at approximately 9:00 a.m. He was still there in the evening when appellant arrived. While there, Murillo received no food or medication, except for an "IV" with morphine. No nurses entered his room and no tests were done.
Appellant neither tried to remove Murillo's ventilator nor prevented staff from caring for him on December 16. He wanted to move to another facility. Appellant contacted an ambulance to transfer him. Staff refused to allow Murillo to leave. Appellant did not place him in any danger.
*277 Between December 16 and 25, 2007, appellant was not allowed to visit Murillo, and the staff physically abused him. The abuse included bringing a meal tray without feeding him, and leaving him in his urine and feces. The nurses and doctors threatened him, also. Murillo felt as if he were imprisoned in the subacute unit. He and appellant filed approximately 30 complaints regarding the subacute unit staff. Jessop-Ellis never discussed these complaints with Murillo.
William Bibby, vice-president of human resources at St. John's, met Murillo on December 5, 2007, after a nurse told him that appellant was yelling and cursing at her. Bibby spoke with Murillo and appellant and asked them not to mistreat the staff. He asked appellant not to raise her voice or curse at employees, and asked her to contact him or the director if she had issues with staff. Murillo called Bibby several times after that.
Bibby reviewed Murillo's complaint that nobody cleaned him after he soiled his bed on a particular date. The medical records for that date reflect that five minutes passed between the time that Murillo soiled his bed and the time that a nursing assistant cleaned him.
On December 25, 2007, appellant visited Murillo. Hacker arrived about 45 minutes later with sheriff's deputies who arrested appellant.
On January 10, 2008, Murillo objected to getting a bath because staff "dumped" him into the whirlpool. Staff ignored his objections and took him to the whirlpool. He was crying as they entered the hallway. He did not like the way they placed him on the gurney; the straps were so loose that he felt as if he flew from the gurney into the water, which then entered his tracheotomy so that he could not speak or breathe. On January 10, when he could not speak or breathe, he made clicking noises with his mouth. The nurses then pulled him from the whirlpool and took him to his room. He was still crying and indicated he wanted to speak with appellant. The nurses remained in his room although he asked them to leave. He told appellant that they were in his room.
Murillo did not threaten the nurses on January 10 or use "the F word against" them. He never told the hospital staff that he was shot while tagging or told Grimaldo or Kern that he was a gang member.[3]

*278 DISCUSSION

Unanimity Instruction
Appellant contends that the dependent adult abuse conviction must be reversed because the court failed to give the jury the CALCRIM No. 3500 unanimity instruction. We disagree.
(1) The state Constitution guarantees criminal defendants a unanimous jury verdict on a specific charge. (Cal. Const., art. I, § 16; People v. Russo (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) When a conviction on a single charge could be based on evidence of two or more discrete criminal acts, all jurors must agree that the defendant committed the same act. Unless the prosecution elects to rely upon a single criminal act, the trial court has a sua sponte duty to instruct the jury that it must unanimously agree beyond a reasonable doubt that the defendant committed the same specific act. (People v. Russo, supra, at p. 1132; CALCRIM No. 3500.)
(2) A unanimity instruction is not required, however, where the evidence shows multiple acts in a continuous course of conduct. (People v. Maury (2003) 30 Cal.4th 342, 423 [133 Cal.Rptr.2d 561, 68 P.3d 1].) "The `continuous conduct' rule applies when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them. [Citation.]" (People v. Stankewitz (1990) 51 Cal.3d 72, 100 [270 Cal.Rptr. 817, 793 P.2d 23].) "`[W]here the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place, the instruction is not necessary to the jury's understanding of the case.' [Citations.]" (People v. Beardslee (1991) 53 Cal.3d 68, 93 [279 Cal.Rptr. 276, 806 P.2d 1311].)
(3) The continuous conduct rule often applies to abuse crimes where the offense can consist of a continuous course of conduct. (See, e.g., People v. Rae (2002) 102 Cal.App.4th 116, 122 [125 Cal.Rptr.2d 312].) We conclude that it applied to the section 368, subdivision (b) dependent adult abuse charge here. The accusatory pleading alleges one violation of section 368, subdivision (b) for conduct occurring between two specified dates, July 1, 2006, and January 10, 2008. Consequently, "[t]he issue before the jury was whether the accused was guilty of the course of conduct, not whether [s]he had committed a particular act on a particular day." (People v. Ewing (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].)
Moreover, any error in failing to give the unanimity instruction was harmless. "The erroneous failure to give a unanimity instruction is harmless if disagreement among the jurors concerning the different specific acts proved is *279 not reasonably possible. [Fn. omitted.] [Citations.]" (People v. Napoles (2002) 104 Cal.App.4th 108, 119 [127 Cal.Rptr.2d 777].) This is such a case. With respect to all relevant acts underlying the abuse charge, other than the failure to wear isolation gear, appellant presented substantially the same defense Murillo's testimony denying that the acts occurred. She also posed a consistent theory about those acts in arguing the casei.e., hospital staff fabricated the alleged acts in response to her complaints against them. As to the failure to wear isolation gear, appellant seems to have suggested or argued that staff did not consistently follow or enforce this rule. It is clear that the jury resolved the basic credibility dispute against appellant and thus would have convicted her of dependent adult abuse based on any of the acts upon which that charge could have been based. Any error in failing to give CALCRIM No. 3500 was therefore harmless beyond a reasonable doubt. (People v. Thompson (1995) 36 Cal.App.4th 843, 853 [42 Cal.Rptr.2d 798].)

There Is Sufficient Evidence to Support Criminal Threat and Attempted Criminal Threat Convictions
Appellant contends that there is insufficient evidence to support her criminal threat and attempted criminal threat convictions. We disagree.
On appeal, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidencethat is, evidence which is reasonable, credible, and of solid valuesuch that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (People v. Johnson (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738]; see People v. Hughes (2002) 27 Cal.4th 287, 370 [116 Cal.Rptr.2d 401, 39 P.3d 432]; People v. Ceja (1993) 4 Cal.4th 1134, 1138 [17 Cal.Rptr.2d 375, 847 P.2d 55].) Conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment. Where evidence is sufficient to justify a reasonable inference that the requisite intent existed, the finding of intent by the trier of fact will not be disturbed on appeal (People v. Ferrell (1990) 218 Cal.App.3d 828, 834 [267 Cal.Rptr. 283]), even if contrary findings might also be reasonable (People v. Lewis (2001) 25 Cal.4th 610, 643-644 [106 Cal.Rptr.2d 629, 22 P.3d 392]). Here, we conclude that sufficient evidence supports the criminal threat and the attempted criminal threat convictions.
(4) Section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the *280 circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety ...." (See also People v. Toledo (2001) 26 Cal.4th 221, 227-228 [109 Cal.Rptr.2d 315, 26 P.3d 1051].) "[A] defendant [commits an] attempted criminal threat where, with the requisite intent, he makes a sufficient threat orally, directly to the victim, but ... where, `for whatever reason, the threat does not actually cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear.' [Citation.]" (People v. Jackson (2009) 178 Cal.App.4th 590, 597 [100 Cal.Rptr.3d 539].)
(5) In this case, Grimaldo is the victim of the criminal threat and Kern is the victim of the attempted criminal threat. We reject appellant's argument that there is insufficient evidence that she intended for her threat to be conveyed to them. Where the threat is conveyed through a third party, the evidence must establish that the defendant specifically intended that the threat be conveyed to the victim. (In re Ryan D. (2002) 100 Cal.App.4th 854, 856 [123 Cal.Rptr.2d 193]; In re David L. (1991) 234 Cal.App.3d 1655, 1659 [286 Cal.Rptr. 398].) While speaking with appellant, Murillo told her that the nurses were still in his room. During their conversation, Kern and Grimaldo heard her scream, "Tell them I am going to find out where they live and I am going to come out and get them." These facts constitute sufficient evidence that appellant intended that the threat be conveyed to Kern and Grimaldo.
(6) Appellant further argues that there is insufficient evidence that she willfully threatened to commit a crime which would result in the death of, or great bodily injury to, either nurse, or that her statement was so unequivocal, unconditional, immediate and specific as to convey to them a gravity of purpose and an immediate prospect of execution of the threat. Words such as "`I'm going to get you,' ... may not, standing alone, convey a threat to commit a crime which will result in death or great bodily injury. But, ... the meaning of the threat ... must be gleaned from the words and all of the surrounding circumstances." (People v. Martinez (1997) 53 Cal.App.4th 1212, 1218 [62 Cal.Rptr.2d 303].) The surrounding circumstances in this case support the inference that appellant's statement was a threat to cause the nurses physical harm. Her conduct in the hospital environment had been physically aggressive and threatening in the past. Her behavior included having a "bad tantrum[]," pushing tables toward employees, yelling, kicking, shoving, and throwing things.
*281 Appellant claims that because she had filed complaints about staff previously, the statement that she would "get" the nurses "could have meant that [she] intended to file complaints [against them]." This claim ignores the entire statementshe threatened to find out where they lived and come and get them. It also ignores the fact that appellant had been physically aggressive and threatening toward staff in the past.
Appellant also argues that her "remarks had no gravity of purpose or immediate prospect of execution" where she could not have carried out her threat because she did not know where the nurses lived. Grimaldo recalled that Murillo said that appellant said, "Tell them I am going to find out where they live and I am going to come out and get them." Appellant knew the nurses' exact location at the time of the threatMurillo's hospital room. She could have followed one of them home that night, at the end of their shift, to "get" them. In fact, Kern requested an escort home that night.
Appellant also argues that as in In re Ricky T. (2001) 87 Cal.App.4th 1132 [105 Cal.Rptr.2d 165], the circumstances following the statement dispel the claim that it was a criminal threat. Ricky T. involved a high school student who became angry when a teacher accidentally hit him with a door as he opened it. After the student cursed the teacher and said he would get him and" `kick [his] ass,'" the student was suspended from school. (Id. at p. 1137.) The teacher waited until the following day to call the police. The appellate court reversed the lower court's finding that the minor made a terrorist threat, concluding there was no immediacy to the threat and no showing of sustained fear. (Id. at pp. 1137-1138.) In contrast, appellant's statements were sufficiently threatening that Kern asked for an escort home that night. She recalled that Murillo said, "My mom says she is going to find where you live because . . . she is going to get you because you are F dumb and if you don't know what to do, F this and F that." Grimaldo also felt very threatened and frightened. There is sufficient evidence that appellant threatened Grimaldo and attempted to threaten Kern.

Section 4019 Conduct Credits

Background
On April 3, 2009, the court sentenced appellant to four years in state prison and awarded her 235 days of presentence credits. On August 19, 2009, the court granted her motion to award 47 additional days of presentence credits. In her opening brief, appellant requests that we order the superior court to issue an abstract of judgment to reflect the total of 282 days of presentence credits (188 days of acutal custody and 94 days of § 4019 credits) that the court awarded her through August 19, 2009, and send a certified copy of the *282 abstract to the Department of Corrections and Rehabilitation, and to counsel for appellant. Respondent does not object to that request, but disputes appellant's contention that she is entitled to additional section 4019 credits, which we address below.

Section 4019 Amendment
We agree with appellant's contention that she is entitled to the retroactive benefit of an amendment to section 4019 that went into effect January 25, 2010, after she was sentenced. That amendment provides for enhanced presentence conduct credits for certain classes of offenders.
Prior to January 25, 2010, subdivisions (b) and (c) of former section 4019 provided that "[f]or each six-day period in which a prisoner is confined in or committed to" a local facility, one day is deducted from the period of confinement for performing assigned labor and one day is deducted from the period of confinement for satisfactorily complying with the rules and regulations of the facility. (Stats. 1982, ch. 1234, § 7, p. 4553.) Subdivision (f) provided that "if all days are earned under this section, a term of six days will be deemed to have been served for every four days spent in actual custody." (Former § 4019, subd. (f).)
"In October 2009, the Legislature passed Senate Bill No. 18 . . . which . . . amended section 4019 to provide for the accrual of presentence credits at twice the previous rate for all prisoners except those [in specified classes of which appellant is not a member]. . . . According to revised subdivision (f), `if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody . . . .' (§ 4019, subd. (f); see also Stats. 2009, 3d Ex. Sess., ch. 28, § 50.) Senate Bill 18 went into effect on January 25, 2010." (People v. Brown (2010) 182 Cal.App.4th 1354, 1360.) Senate Bill No. 18 (2009-2010 3d Ex. Sess.) does not state that it must be applied retroactively. (182 Cal.App.4th at p. 1360.)
Appellant served a total of 188 days in presentence confinement. In addition to receiving credit for those 188 days, she was awarded 94 days of conduct credits under former section 4019. As revised, section 4019 would provide her 188 days of conduct credits.
(7) "Penal Code section 3 provides that no part of the Penal Code is retroactive unless specifically so declared. However, in In re Estrada [(1965)] 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948], the Supreme Court carved out an exception of that rule. Estrada held that laws granting amelioration in *283 punishment should be held to be retroactive as to nonfinal judgments because it would be presumed the amelioration of the punishment was based on the legislative finding that the former punishment was too severe." (People v. Doganiere (1978) 86 Cal.App.3d 237, 239 [150 Cal.Rptr. 61].)
Four appellate courts have addressed the retroactivity of the recent section 4019 amendment. In People v. Rodriguez (2010) 182 Cal.App.4th 535, 540 [105 Cal.Rptr.3d 345], the Fifth District concluded that the section 4019 amendment increasing conduct credits does not apply to defendants sentenced before January 25, 2010.
Three other appellate courts reached a contrary conclusion:
Division One of this district concluded in People v. House (2010) 183 Cal.App.4th 1049 that amended section 4019 applies retroactively. Division Two of the First District reached the same conclusion in People v. Landon (2010) 183 Cal.App.4th 1096 and noted that it agreed with the Third District's reasoning in People v. Brown. In People v. Brown, the Third District reasoned that because "the true intent of the [Legislature's amendment to section 4019 (increasing conduct credits)] was to reduce the time in prison for eligible defendants . . ., it must be presumed the [amended section] was intended to be applied retroactively . . . ." (People v. Brown, supra, 182 Cal.App.4th at p. 1365; see also People v. Hunter (1977) 68 Cal.App.3d 389, 392-393 [137 Cal.Rptr. 299] [absent express statement of retroactive or prospective application, amendment to § 2900.5 allowing for an award of presentence custody credits "must be construed as one lessening punishment" within the meaning of Estrada]; People v. Doganiere, supra, 86 Cal.App.3d at p. 240 [where Legislature adopted statute providing conduct credits under Estrada, "it must be presumed that the Legislature thought the prior system of not allowing credit for good behavior was too severe"].)
We conclude that appellant is entitled to receive conduct credits under the revised provisions of section 4019. (People v. Brown, supra, 182 Cal.App.4th 1354, 1365; People v. House, supra, 183 Cal.App.4th 1049; People v. Landon, supra, 183 Cal.App.4th 1096.)

DISPOSITION
The judgment is reversed only as to the calculation of appellant's presentence conduct credits. On remand, the trial court is directed to recalculate appellant's presentence conduct credits under section 4019, as amended. The *284 court is further directed to amend the abstract of judgment to reflect appellant's increased presentence conduct credits, to certify a copy of the amended abstract of judgment, and forward it to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.
Gilbert, P. J., and Perren, J., concurred.
NOTES
[1] Appellant represented herself at trial.
[2] All statutory references are to the Penal Code.
[3] Because Murillo had denied that he was expelled from high school during his cross-examination, the prosecution called rebuttal witness John Saunders. Saunders testified that he was the assistant principal at Hueneme High School when it expelled Murillo for acts of violence.